**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

RANHAO LIN, both directly and derivatively on
behalf of WHOOP CONNECT, INC., and SUNICS
INDUSTRIAL LIMITED,

                              *Plaintiffs*,

              v.

ERIC STEFAN SCHOUTEN, FRANK VAN DEN
BERG, WHOOP CONNECT, INC. and
SUNTAK USA, INC.,

                              *Defendants.*

Civil Action No.  1:26-cv-02952

**COMPLAINT**

**Jury Trial Demanded**

---

        Plaintiffs Ranhao Lin ("Lin"), both directly and derivatively on behalf of Whoop Connect,

Inc. ("Whoop"), and Sunics Industrial Limited ("Sunics")  (collectively, "Plaintiffs"), by and

through undersigned counsel, bring this Complaint for damages against Defendants Eric Stefan

Schouten ("Schouten"), Frank van den Berg ("Van den Berg"), Whoop Connect, Inc. ("Whoop"),

and SunTak USA, Inc. ("SunTak") (collectively "Defendants") based on material breaches of a

Subscription and Grant Agreement (the "Agreement"),[1] as well as for account stated, fraud, an

accounting, and unjust enrichment (in the alternative). In support of these claims, Plaintiffs state

the following.

## INTRODUCTION

        1.      This action arises out of what can only be described as a malicious and fraudulent

scheme by Defendants, with the singular goal of extracting significant sums of money from

Plaintiffs. Defendants' wrongful conduct ranged from outright lies and misstatements and

---

[1]      A copy of the Agreement is attached at Exhibit A. Section 6 of the Agreement provides
that it is governed by Delaware law and suits are to be brought in New York. *See* Ex. A at § 6.

omissions to brazen breaches, as well as the improper retention of valuable inventory that was delivered to Defendants by Plaintiffs but for which Defendants have not made the required payments to Plaintiffs.

2.      After being aggressively pursued by Defendants, Plaintiff Ranhao Lin agreed to provide Defendants with desperately needed capital, financing, and product inventory for Whoop. After securing these critical commitments from Lin, Defendants then took actions that were specifically designed to obtain as much money and product as possible from Plaintiffs but for Defendants' own benefit, while simultaneously providing Plaintiffs with false and misleading information about Whoop and its operation and financials.

3.      In doing so, Defendants have deprived Plaintiffs of substantial payments that were rightfully due to them pursuant to clear agreements. And, in addition, by feeding Lin a false narrative about Whoop's business and finances—perpetuated by the creation of fictitious and manipulated transaction data—and about a supposed catastrophic market collapse, Defendants also sought to coerce Plaintiffs into accepting steep, unwarranted discounts on grossly overdue debts while Defendants simultaneously worked to line their own pockets.

4.      This strategic misinformation also served as a smokescreen, enabling Defendants to systematically divert corporate assets for personal enrichment while leaving Lin to shoulder the actual financial losses.

5.      Pursuant to Delaware substantive law, Lin brings direct claims against Defendants for fraudulent inducement, fraudulent misrepresentation, fraudulent concealment, civil conspiracy, an account stated, and breach of contract, and seeks to recover monetary damages that have been directly and proximately caused by Defendants' wrongdoing.

6. In addition, and also pursuant to Delaware substantive law, Lin brings both direct and derivative claims for breaches of fiduciary duties both owed to Lin individually and as a shareholder of Whoop.

7. As detailed below, Defendants Schouten and Van den Berg have knowingly, willfully, and quite brazenly sought to enrich themselves to the detriment of Lin and Whoop. To accomplish this scheme, Defendants Schouten and Van den Berg have mismanaged corporate funds, squandered corporate opportunities, and diverted funds improperly.

## **PARTIES**

8. Plaintiff Lin is an individual residing in Hong Kong.

9. Plaintiff Sunics is a corporation, both incorporated and having its principal place of business in Hong Kong.

10. Defendant Eric Stefan Schouten is an individual who is a Dutch national living in Florida.

11. Defendant Frank van den Berg is an individual who is a Dutch national living in the Netherlands.

12. Defendant Whoop is a corporation, incorporated in the State of Delaware and has its principal place of business in the State of Florida.

13. Defendant SunTak is a corporation, incorporated in the State of Delaware and has its principal place of business in the State of Florida.

14. Defendant Whoop is registered with the State of New York as a Foreign Business Corporation and has post office address at c/o Incorp Services, Inc., One Commerce Plaza – 99 Washington Ave., Suite 805-A, Albany, NY 12120.

15. Defendant SunTak is a wholly owned subsidiary of Whoop.

3

## JURISDICTION

16.     This Court has subject matter jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332, as the Parties are completely diverse in citizenship and the amount in controversy exceed $75,000.00. Lin is a Canadian citizen. Plaintiff Sunics is a Chinese corporation, which was incorporated in and with its principal place of business located in Hong Kong, and Defendants Whoop and SunTak are corporations incorporated in the State of Delaware and have their principal place of business in the State of Florida. Defendants Schouten and Van den Berg are Dutch nationals residing in the State of Florida and the Netherlands, respectively.

17.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because this Court has original jurisdiction over this controversy pursuant to 28 U.S.C. § 1332.

18.     Pursuant to Section 6 of the Agreement, the Parties agreed that any legal action arising out of the Agreement shall be brought exclusively in New York City, New York.

19.     This Court has personal jurisdiction over Defendant Whoop because Whoop explicitly and irrevocably submitted to the personal jurisdiction of this Court by signing the Agreement. This action arises directly from the Agreement, and thus, this Court has personal jurisdiction over Whoop based on its contractual consent.

20.     Furthermore, this Court has personal jurisdiction over Defendant Whoop because Whoop is a foreign corporation doing business or authorized to do business in New York and this action arises out of Whoop's activities in New York, including but not limited to, maintaining an office in New York, and selling devices in New York.

21.   This Court has personal jurisdiction over Defendant SunTak as it is a wholly owned subsidiary of Whoop and was used in part by Whoop to carry out its obligations under the Agreement.

22.   This Court has personal jurisdiction over Defendants Schouten and Van den Berg as directors of both Defendants Whoop and SunTak, the former of which is authorized to do business in New York and the latter of which is a wholly owned subsidiary of Whoop.

23.   This Court also has personal jurisdiction over Defendant Schouten and Van den Berg pursuant to the forum selection clause in the Agreement.

24.   This Court also has personal jurisdiction pursuant to Section 301 of the New York Civil Practice Law and Rules because Whoop and SunTak are foreign corporations that transact business and contract to supply goods or services in New York, and Defendants Schouten and Van den Berg are directors of both Whoop and SunTak.

25.   Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(2)(3) and (c)(3) as because the Agreement at issue contains a forum selection clause requiring any action related to or arising under the contract be brought in this District. Moreover, Defendants consented to and waived any objection to venue in this judicial district in the Agreement.

## FACTUAL ALLEGATIONS

26.   Lin is the CEO of Plaintiff Sunics.

27.   Plaintiff Sunics is a Hong Kong-based trading company and distributor of tablets, watches, and phones manufactured in China. Lin and Plaintiff Sunics are entitled to recover any and all damages resulting from the fraudulent and tortious conduct alleged herein pursuant to an assignment of interest.

28.    Defendant Schouten is the CEO of Defendant Whoop. As CEO, Defendant Schouten oversees all of Whoop's operations and plays an integral role in all of Whoop's business decisions, including its communications with Plaintiffs.

29.    Defendant Van den Berg is a Director of Defendant Whoop. As a Director, Defendant Van den Berg plays an integral role in all of Whoop's business decisions, including its communications with Plaintiffs.

### *Lin and Whoop's Initial Business Negotiations*

30.    Lin and Defendant Schouten first communicated in November 2021 regarding a standard phone and tablet distribution arrangement. Over the course of months, their discussions focused on developing a potential business relationship with Lin, through his entities in China, to provide Defendant Schouten, and his related individuals and entities, with phones and tablets manufactured in China.

31.    In July 2022, after months of little to no activity, Defendant Schouten shifted the conversations toward Lin supplying tablets to Whoop, which would then resell the tablets to customers through the Affordable Connectivity Program ("ACP"), a federal initiative geared toward making internet service more affordable for low-income households. Defendant Schouten was specifically interested in growing the ACP-based business significantly.  This was the first time Defendant Schouten mentioned his plan to resell the devices through the ACP.

32.    It was through the ACP that Defendants Schouten and Van den Berg believed they could reap significant financial benefits via the Whoop venture.

33.    Defendant Schouten represented to Lin that the ACP presented an immense, time-sensitive opportunity to scale Whoop's business exponentially.

34. However, Defendants Schouten and Van den Berg also recognized that doing so would be highly capital-intensive, requiring significant financial investments into Whoop.

35. It was this need for financial investment and capital that motivated Defendants Schouten and Van den Berg to set their sights on Lin as a potential source of money.

36. At that time in 2022, most ACP tablet transactions between wireless providers and Chinese suppliers were conducted using telegraphic transfer (T/T) or letter of credit terms, both of which eliminate counterparty credit risk.

37. Defendants Schouten and Van den Berg, however, wanted to pursue a different form of transaction known as an open account credit arrangement, which is where the goods are delivered before payment is due. This type of transaction is far riskier for the seller of the goods.

38. Lin had studied the ACP landscape and concluded that while the business opportunity with Whoop was potentially worthwhile, it was also highly capital-intensive and would require substantial upfront liquidity for subscriber acquisition and retention. Indeed, in Lin's view, without a major capital injection, Whoop would likely not be a successful company.

39. Defendant Schouten explicitly acknowledged that Whoop lacked the necessary upfront liquidity to scale beyond a marginal player in the ACP market.

40. In order to address this lack of liquidity and need for capital, Defendants aggressively pursued, and aggressively sought to induce, Lin to assume the role of a de facto financier for Whoop.

41. As part of this aggressive campaign to induce Lin to invest in Whoop, Defendant Schouten represented to Lin that, in addition to selling tablets to customers via the ACP, Whoop would also be able to sell inventory via other avenues.

42.    Despite Whoop's limited capital at the time, Defendant Schouten represented that it had "giant orders" pending, thus requiring Lin's collaboration to fulfill said orders.

43.    Specifically, in a July 22, 2022 email, Defendant Schouten represented to Lin that Whoop had obtained a license to sell pre-paid phones SIM cards through T-Mobile. The plan was to utilize this license to also sell phones and hardware with other retail partners, such as ALDI Grocery Stores, in conjunction with selling phones through the Whoop website.

44.    Thus, the foregoing representation provided further assurance to Lin that Defendants Schouten and Van den Berg were not exclusively working toward reselling the devices as part of the ACP. However, it became clear later that Defendants did not actually intend to pursue this opportunity.

45.    Because Defendants sought to purchase tablets from Lin and his entities on open account terms, Lin expressed his interest in becoming a strategic financial investor in Whoop as a requirement to entering into any such agreement. Lin conveyed this requirement to Defendants because without direct access to operational data and cash flow records, he would not be in a position to evaluate counterparty credit risks, particularly since this was his first business venture with Defendants.

46.    Defendant Schouten and Defendant Van den Berg also wanted Lin to become an investor in Whoop, which would provide much needed capital to the company.

47.    Prior to finalizing an agreement with Defendants, Lin also expressly identified and communicated to Defendants Schouten the risks associated with the ACP project under open account terms, and he further sought express assurances from Defendants that these risks would be mitigated by Defendants through payment certainty and inventory management.

48.     In July 2022, Defendants, through Defendant Schouten, assured Lin that both risks were manageable. Specifically, Defendant Schouten stated that the federal government would consistently pay on time provided the documentation was prepared correctly. Furthermore, he claimed that Whoop would mitigate inventory risks through strategic ordering and emphasized that Whoop possessed established sales channels in the United States to sell excess inventory if necessary. These statements and assurances turned out to be both false and misleading.

49.     In addition, Defendant Schouten made other express assurances and statements to Lin in order to induce him to enter into a business relationship with Whoop.

50.     For example, on or about July 8, 2022, Defendant Schouten presented Lin with a profit and loss forecast and promised Lin that Whoop would realize $70 million in net profit in two years. This was a false statement.

51.     In conjunction with this inflated $70 million net profit figure, Defendant Schouten also represented that as of July 2022 Whoop had raised $1.3 million in funding and only needed the $700,000 to achieve its capital goal. However, financial documents show that at that time, Whoop in reality had significantly way less than a million dollars in capital.

52.     Defendant Schouten also made assurances regarding a commitment to manage all inventory risks. In this regard, during phone calls which occurred between July 20 and July 28, 2022, Defendants Schouten and Van den Berg claimed to personally negotiate the quantities and pricing for each transaction, along with any credit exposure. These assurances were also false.

53.     Moreover, during these phone calls, Defendants Schouten and Van den Berg based their decisions regarding how much inventory to purchase based on their own internal ACP demand forecasts, which would be negotiated on a deal-by-deal basis. Their statements to Plaintiffs, however, turned out to be wildly and intentionally inaccurate. Defendants falsely

represented their need for more device inventory, despite the fact that they already were struggling to liquidate the remaining inventory. Defendants also knew that Lin would be the one to bear the financial burden of this inaccurate forecasting.

54.    Defendant Schouten also made express assurances to Plaintiffs, guaranteeing complete and total transparency with respect to the operations and finances of Whoop, indicating that Lin would receive regular updates concerning Whoop, its inventory, and the ongoing sales efforts. This, too, turned out to be false as Defendants withheld critical information from Lin and provided him with misleading and/or outright falsified documents concerning Whoop's financials and inventory management.

55.    For example, on December 20, 2024, Defendant Schouten sent a text message to Lin stating that Lin would stay "informed about opportunities and progress" on bi-weekly calls. On the same date, Defendant Schouten represented that there appeared to be "strong opportunities and potential sales, especially regarding distribution." Defendant further stated that "based on discussions . . . sales will occur soon, which would help clear any outstanding invoices." These statements were false.

56.    Relying on all of the foregoing assurances, which Lin had no reason to believe were false, Lin entered into a business venture with Defendants.

### The Subscription Agreement

57.    On July 28, 2022, Defendant Whoop entered into the Agreement with Lin. A copy of the Agreement is here attached as Exhibit "A".

58.    On this same day, July 28, 2022, concurrently with the execution of the Agreement, Lin sent an email memorializing the terms under which Plaintiffs would sell tablets to Defendants,

10

which Defendant Schouten expressly assented to on Whoop's behalf (the "July 28, 2022 email"). A copy of the July 28, 2022 email is attached at Exhibit B.

59.     Per the express terms of the Agreement, Whoop was obligated to pay the purchase price for any device purchased from one of Lin's entities that was subsequently sold by Defendant Whoop.

60.     The Agreement also expressly guaranteed that Lin would have the right to inspect books and records related to tablet sales. *See* Ex. A at §1(b)(iii).

61.     Lin would never have agreed to go into business with Defendants without a clear and mutual understanding regarding the payment terms set forth in the July 28, 2022 email.

62.     In reliance on the assurances made by Defendants, and pursuant to the Agreement, Lin purchased 140 shares of stock in Defendant Whoop, which represented a 14% stake in the company.

63.     In total, Lin agreed to invest $800,000.00 in Whoop.

64.     However, at Defendants' direction and request, the $800,000.00 payment from Lin was allocated as follows: Lin paid $400,000.00 directly to the Whoop corporate account, while the remaining $400,000.00 was paid to three Dutch investment funds under the control of Defendants Schouten and Van den Berg, as well as Van den Berg's wife. This payment to the Dutch investment funds was done at the express request of Defendants.

65.     As a result of the foregoing, as of July 3, 2023, Lin owned 14% of Whoop as confirmed by Defendant Schouten in written communications.

### The Tablet Supply Arrangement

66.     Pursuant to the Agreement, Lin agreed to supply Defendant Whoop with tablets that could then be sold by Whoop to customers through the ACP.

67.     Following execution of the Agreement, Lin and Defendant Whoop agreed to handle the purchase and sale of tablets as between Lin and Whoop as follows: Lin, through his entities Sunics and SunPro Industrial Limited, would sell ACP-approved tablets to Defendant Whoop pursuant to purchase orders at an agreed-upon purchase price per tablet. Defendant Whoop would then resell the tablets to its customers and make payment to Lin through either Sunics or SunPro. Indeed, the Agreement contains specific provisions regarding the sale of tablets to the Company.

68.     After the Agreement was signed, Lin, Defendant Schouten, and Defendant Van den Berg would regularly discuss the details of each batch of tablets purchased by Whoop, including specifying the quantity of tablets and purchase price for each. Both Defendants Schouten and Van den Berg actively participated in the negotiations for each order of devices.

69.     Indeed, for each order that was discussed and negotiated between the Parties, a purchase order and an invoice was issued thereafter which contained a stipulation that the payment term for the devices was a 75-day open account starting after the shipment date. These were highly favorable commercial terms to Whoop.

70.     Lin only agreed to these terms based on Defendants Schouten and Van den Berg's broken promises of total transparency in data sharing, robust inventory risk management, and their purported infrastructure for rapid sell-through of the inventory.

71.     From October 2, 2022 through November 27, 2024, Lin, through Sunics, SunPro, and another Hong Kong entity SunTak Industrial Limited, shipped and delivered ACP-approved tablets, phones, and watches to Whoop in accordance with the Agreement and the purchase orders.

72.     Critically, for each shipment, delivery was completed upon the handover of goods to the freight forwarder specifically designated by Defendants. At that precise point, title to the goods passed to Defendants SunTak and Whoop, who assumed all subsequent costs,

12

responsibilities for freight, and risks of transit to the United States. Under this arrangement, Lin and his entities fully performed their contractual obligations upon delivery to the designated forwarder, at which time Whoop's obligation to pay the agreed-upon purchase price materialized.

73.    Each purchase of devices has an accompanying purchase order signed by Defendant Schouten, invoice, and bill of lading which contains the specific details of each transaction.

74.    Moreover, to further formalize the payment obligation, at the end of each month, Lin and his entities sent comprehensive email summaries to Defendants, detailing all shipments delivered and the corresponding amounts due. Defendants received these monthly reconciliations and, significantly, never raised any objections, disputes, or corrections regarding the accuracy of the invoiced amounts or the quality of the goods delivered.

75.    This supply arrangement would continue under the Agreement until either the expiration of the ACP, or a defined "change in control" in Defendant Whoop, whichever occurred first.

76.    In total, Lin and his entities shipped $49,653,360.00 worth of tablets, phones and watches to Whoop, which Whoop accepted. As of the date of this filing, approximately $981,000 worth of tablet inventory remains in China undelivered.

### *The Termination of the ACP*

77.    In the months leading up to the ACP's termination, Lin repeatedly cautioned Defendants regarding the program's imminent expiration and suggested contingency planning for the outstanding inventory.

78.    Given the rumors of the ACP's termination, most market participants were *not* ordering ACP-approved tablets.

79. Despite these warnings, Defendant Van den Berg proceeded to place a massive final order of 100,000 tablets in December 2023 during a meeting between the Parties in Hong Kong.

80. This conduct deviated sharply from standard commercial prudence; at that time, no other major industry participant was placing large-scale tablet orders due to the program's widely anticipated termination.

81. As of June 1, 2024, the ACP was terminated, along with Lin's supply obligations under the Agreement.

82. However, the end of the supply arrangement under the Agreement did not alleviate Whoop of its obligation to pay the full agreed-upon purchase price for the tablets that had been previously purchased and delivered pursuant to the Agreement, nor did it alleviate Whoop of its obligation to resell these tablets to its customers.

83. Given the termination of the ACP, Lin communicated to Defendants that it would be prudent to focus on liquidating the remaining device inventory and recovering as much money as possible for the remaining inventory.

84. However, Defendants Schouten and Van den Berg continued to purchase devices and remained silent regarding Whoop's actual insolvency. Defendants affirmatively represented to Lin that they were "actively working towards" liquidating the devices to generate funds to pay Lin. Defendants did this knowing full well that they would be obligated to pay for these purchases, but also with the knowledge and intent that they would not in fact pay for these purchases and would instead shift that financial loss on to Plaintiffs.

85. In response to Lin's concern regarding liquidating inventory, Defendants Schouten and Van den Berg repeatedly misled Lin by representing that the ACP program was "very likely

14

to continue." These false assurances were designed to convince Lin that the existing inventory would be fully utilized under the program's extension. It was not until November 2024, when it became indisputable that the ACP program would not be renewed, that Lin began to demand an immediate resolution of the outstanding payments.

86.     Defendants' strategic use of misinformation regarding the ACP's status was a calculated effort to delay Lin's discovery of the company's insolvency and their ongoing misappropriation of funds.

87.     When Lin would press Defendants Schouten and Van den Berg for updates regarding the inventory, Defendants Schouten and Van den Berg maintained that they were undertaking all possible efforts to sell the devices, but poor market conditions hindered their ability to do so.

88.     Defendants Schouten and Van den Berg consistently maintained that these were the best prices obtainable given the lack of market demand.

89.     Much of the inventory, which is valued at over $10,000,000.00, remains unpaid to this day despite Defendants numerous representations that they were working towards liquidating inventory.

90.     For example, in March 2025—at a time when Lin was increasingly questioning the lack of transparency—Defendants Schouten and Van den Berg represented that they had secured something called the "Kansas Project."

91.     They explicitly characterized this project as a "done deal" that would finally liquidate all remaining tablet inventory and settle the outstanding debt owed to Lin. Relying on this specific and categorical assurance, Lin was induced to believe that a full recovery of his capital

15

was imminent; consequently, he agreed to temporarily suspend his collection efforts and formal demands, including forbearing from commencing a lawsuit.

92.    However, by May 2025, Lin discovered that the "Kansas Project" was entirely unsubstantiated and bore no resemblance to the "done deal" Defendants Schouten and Van den Berg had described. It became clear that the project was a fabrication utilized as a fraudulent delay tactic.

93.    This just one of many instances in which Defendants shifted their narrative to explain the stagnant inventory.

94.    At first, around summer 2024, Defendant Schouten represented that the devices could not be sold due to "low pricing."

95.    Then, in August 2025, Defendants again found another excuse, claiming that thousands of devices were returned for a variety of reasons, valued at roughly $1.56 million, contributing to their failure to pay Lin. Defendants never provided Lin with timely notice of any issues with the devices. In fact, Defendants always acknowledged the good quality of devices.

96.    Importantly, there is no agreement amongst the Parties addressing issues related to returned devices, loss allocations, or any mechanism permitting Defendants to unilaterally offset debts based on purported product returns.

97.    Before the ACP was terminated, Defendant Whoop entered into various distribution contracts in order to sell the devices.

98.    As part of these distribution contracts, Defendant Whoop handed over thousands of devices to these third-parties.

99.    Upon the termination of the ACP, Whoop failed to retrieve many of the devices that were provided to these third-party distributors to sell. In March 2026, Defendants claimed the

"field loss" was around $2 million; however, this figure remains entirely unverified, as Defendants have failed to provide any supporting documentation, third-party audit reports, or physical evidence to substantiate such a significant depletion of inventory.

100.    Importantly, Lin was never informed of any issues with the device inventory being in a third-party's possession, nor was he apprised of the specific "field loss" figures.

101.    Of further concern—Lin was only notified of these issues with third parties in March 2026 after months of pressing both Defendants Schouten and Van den Berg for an update as to the device inventory and the status of sales.

102.    The changing stories and evolving excuses are simply delay tactics to disguise the actual condition of the device inventory and to avoid remitting full overdue payments to Lin.

103.    By inducing this temporary forbearance through deliberate misrepresentations, Defendants successfully bought themselves months of additional time to continue siphoning corporate assets while close to $10 million of Plaintiffs' assets remain within Defendants' custody and control.

104.    Most importantly, however, regardless of whether certain devices were actually sold, lost, returned, or given out for free, as indicated on the purchase orders and invoices, termination of the ACP had no effect on the 75-day open account payment term obligations of Whoop or SunTak. Thus, Defendants Schouten, Van den Berg, Whoop, and SunTak agreed to pay for their purchase of tablets within seventy-five (75) days as specified in the proforma invoices.

105.    Defendants Schouten and Van den Berg acknowledged this arrangement and debt, noting in a November 13, 2024 message to Lin that they were working on "paying back" Lin and that there were "open invoices."

17

106. Additionally, in Defendant Whoop's 2024 financial report, the outstanding payments to Plaintiffs were explicitly categorized as long-term liabilities, specifically noting that the outstanding payments due to Sunics were 91 days overdue.

107. In fact, at the outset of Lin and Defendant Whoop's business relationship, Defendant Whoop prepaid Plaintiffs a total of $3,000,000.00 for 60,000 devices—in direct contradiction with the terms of the Agreement.

108. The Parties' course of dealing clearly shows a pattern in which Defendants would pay Plaintiffs according to the terms of the purchase orders. In some instances, Defendants even paid the overdue amount *with interest*, thus acknowledging that each purchase order needed to be paid per the seventy-five (75) day open account term.

109. Of the fifty-eight (58) device shipments, fifteen (15) of those shipments received by Whoop between August 31, 2024 to November 11, 2024 remain unpaid.

110. Specifically, the following shipments of devices were delivered and accepted by Defendant Whoop but remain either entirely or partially unpaid to this day:

| Shipment Date | Total Units | Total Amount | Balance Due | Payment Due Date |
|---|---|---|---|---|
| August 24, 2023 | 21,600 | $1,101,600.00 | $576,600.00 | November 7, 2023 |
| August 31, 2023 | 12,560 | $817,100.00 | $732,100.00 | November 14, 2023 |
| September 14, 2023 | 21,600 | $1,047.600.00 | $1,047,600.00 | November 28, 2023 |
| October 12, 2023 | 21,600 | $1,047.600.00 | $1,047,600.00 | December 26, 2023 |
| November 5, 2023 | 17,280 | $734,400.00 | $734,400.00 | January 19, 2024 |

| November 30, 2023 | 1.600 | $92,000.00 | $44,000.00 | February 13, 2024 |
|---|---|---|---|---|
| December 18, 2023 | 12,360 | $610,896.00 | $281,696.00 | March 2, 2024 |
| December 24, 2024 | 16,840 | $846,980.00 | $566,180.00 | March 8, 2024 |
| January 4, 2024 | 12,240 | $631,800.00 | $480,600.00 | March 19, 2024 |
| January 14, 2024 | 14,440 | $784,800.00 | $772,800.00 | March 29, 2024 |
| January 22, 2024 | 10,800 | $588,600.00 | $588,600.00 | April 6, 2024 |
| February 6, 2024 | 6,480 | $321,408.00 | $321,408.00 | April 21, 2024 |
| February 7, 2024 | 14,400 | $767,160.00 | $767,160.00 | April 22, 2024 |
| May 15, 2024 | 7,800 | $360,300.00 | $360,300.00 | July 29, 2024 |
| September 4, 2024 | 10,980 | $629,116.00 | $629,116.00 | November 18, 2024 |
| November 27, 2024 | 10,140 | $324,660.00 | $324,660.00 | February 2, 2025 |

111. With each shipment there is a corresponding bill of lading, purchase order, and invoice.

112. This debt comes out to approximately $10,255,820.00, all of which has been exclusively carried by Lin and his related entities. This figure includes $9,274,820.00 in outstanding invoices for devices already delivered to and accepted by Defendants in the United States, as well as approximately $981,000.00 worth of finished inventory currently held in China, which was manufactured and held specifically for Defendants' orders, but Defendants have failed to take delivery or provide payment for these goods, despite the absolute obligation to do so.

113. Moreover, Plaintiffs sent Defendants monthly statements reflecting the balance owed to Plaintiffs. Defendants never objected to the accuracy of these statements.

114. Since November 27, 2024, Defendants have been sitting on approximately $9,274,820.00 in unsold ACP-approved tablet, phone, and watch inventory purchased from and delivered by the Plaintiffs. It has been almost two years since the ACP was terminated, yet Defendants have failed to satisfy these mounting financial obligations.

115. Defendants Schouten and Van den Berg have claimed in March 2026 that a portion of these devices were distributed for "free" for customer retention purposes, a portion was "lost" in the field, while another portion was sold following the termination of the ACP program. Notably, all figures and categories of disposition provided by Defendants remain entirely unverified and unaudited.

116. To the best of Plaintiffs' knowledge and belief, more than 90% of the devices for which Plaintiffs have not been paid are now no longer in Whoop's warehouse, in stark contrast to Defendants' inconsistent and unsubstantiated claims regarding the status of the inventory.

117. Defendants have failed to apply any other corporate funds—including substantial revenues received from the federal ACP program—toward reducing the massive and mounting overdue debt owed to Plaintiffs. Defendants have effectively shielded Whoop's broader cash flow from its obligations to Lin, while simultaneously siphoning millions of dollars in other corporate assets for their personal gain and related-party loans.

118. Through verbal and written communications, Defendants claimed they sold some of the inventory, but this assertion has not been verified by any accounting records. Specifically, Defendants have failed to provide any evidence of sales details (including but not limited to purchase orders and bank receipt records) or reports on the remaining inventory of the tablets, despite being contractually obligated to.

20

119.    Although Defendants Schouten and Van den Berg represented that the devices have not been sold due to poor market conditions, the reality is that Defendant Whoop has in fact been able to sell devices at a higher price and volume than what was represented to Lin. Moreover, there were several device sales regarding which neither Defendant Schouten nor Defendant Van den Berg ever informed Lin.

120.    Specifically, Defendant Whoop sold 10,000 units of 10-inch tablets at $32/unit on February 21, 2025, and 5,400 units of 8-inch tablets at $28/unit on July 3, 2025. Neither sale was reported to Lin. In addition to these specific instances, Plaintiffs have identified at least ten (10) other similar transactions where Defendants surreptitiously sold inventory and intentionally withheld the proceeds. These identified transactions are, upon information and belief, merely the 'tip of the iceberg' of a much larger, coordinated scheme to defraud Plaintiffs, coerce heavy discounts, and embezzle funds.

121.    Additionally, Defendant Whoop sold 10,000 units of 10-inch tablets at $32/unit on March 13, 2025, and 10,000 units of 10-inch tablets at $32/unit on March 31, 2025. However, Defendants Whoop, Schouten, and Van den Berg reported that these March 2025 units were sold at $30/unit, intentionally under-reporting the amount of money earned, and in turn, owed to Plaintiffs.

122.    To the best of Plaintiffs' knowledge, Defendant Whoop sold approximately 150,000 units of devices from a specific warehouse based in Kentucky between April 2025 to February 2026, totaling $4.3 million.  Of that $4.3 million, only $1.4 million (52,250 units) was reported to Lin—leaving 68% of the sale price unaccounted for.

123.    At the end of March 2026, Defendant Whoop informed Plaintiffs that it had reported a potential $8 million theft to the Kentucky police and issued its own demand letter.

21

124. In fact, Defendant Whoop has not reported a single purchase to Lin since November 2025—despite the fact devices are still being sold and Defendants are collecting payments based on information provided to Plaintiffs by third parties.

125. Just from these transactions alone, Defendants have withheld millions of dollars from Lin.

126. Defendants Schouten and Van den Berg falsely represented that the devices remained unsold due to "poor market conditions."

127. For example, Defendant Schouten made the following representations in response to Lin's inquiries as to the status of device sales:

   a. On June 16, 2025, Defendant Schouten told Lin that potential customers were offering "really low pricing;"

   b. October 16, 2025, Defendant Schouten told Lin that "offers are currently lower;"

128. Defendants Schouten and Van den Berg echoed the same misrepresentations in conversations with Lin—specifically, that poor market conditions were impeding the device sales.

129. In reality, Defendant Whoop successfully sold a significant number of devices from March 2025 to February 2026—far exceeding the figures disclosed to Lin.

130. Furthermore, the Defendants' proffered excuse of "excess inventory" to Lin is utterly belied by industry-wide data. While the Federal ACP program officially terminated in June 2024, by May 2025—nearly a full year later—the market had effectively absorbed all available tablet inventory. No major market participants or competitors held substantial stockpiles of devices by this date.

131. These undisclosed transactions and price manipulations were part of a broader scheme by Defendants Schouten and Van den Berg to underreport corporate revenue and skim

profits, thereby depriving Lin of his rightful share of the proceeds and the transparency he was contractually guaranteed under the Agreement.

132.    Furthermore, Defendants sought to exploit these fraudulent misrepresentations by creating a falsified narrative of financial panic and impending business collapse.

133.    Moreover, despite Defendants' alleged inability to resell the devices, Defendants Schouten and Van den Berg have continued to live an opulent lifestyle, complete with luxury cars, high-end real estate, and extensive, high-end renovations to that real estate, all funded by the very capital diverted from Whoop arising from sales of inventory for which payment should have been remitted to Plaintiffs but never was.

134.    Defendants have systematically misappropriated corporate funds—capital that should have been utilized to settle Plaintiffs' overdue payables—to finance significant personal luxuries.

135.    Furthermore, Defendants have engaged in excessive and non-business-related expenditures, such as hosting and entertaining personal associates from the Netherlands on lavish trips to Las Vegas.

136.    This stark contrast between Whoop's purported insolvency—as stated to Lin by Defendants Schouten and Van den Berg—and the individual Defendants' personal extravagance demonstrates that Whoop was utilized as a mere alter ego for the Defendants, who systematically siphoned corporate assets, to enrich themselves at the direct expense of their creditors and shareholders, which included Plaintiffs.

### *Defendants Schouten, Van den Berg, and Whoop's Fraud and Breaches*

137.    Defendants Schouten and Van den Berg allocated funds intended to capitalize Whoop into Dutch investment funds controlled by Defendants.

23

138. Defendants Schouten and Van den Berg also received undisclosed, private dividend distributions from Whoop, and Lin was specifically and intentionally excluded from these distributions for nearly two years.

139. In 2025, after reviewing Whoop's 2024 financial statements, following repeated and forceful demands, Lin discovered that Whoop had ample financial capacity to satisfy all of its obligations.

140. This disclosure revealed a shocking pattern of financial manipulation.

141. Previously, Defendant Schouten had presented Lin with a 2023 financial summary showing a $13 million net loss, which he characterized as a mere "tax deferral arrangement" to dissuade Lin from further inquiry. However, the 2024 formal report revealed that the 2023 figures had been retroactively altered to reflect only a negligible loss, uncovering a deliberate attempt to sanitize the company's books.

142. It was through this belated transparency that Lin finally discovered the reality: while he was being told the Company was struggling, Defendants were actually overseeing and taking advantage of significant positive cash flow that was being systematically diverted for their own benefit.

143. Significantly, throughout 2023 and 2024—the very period during which Defendants were defaulting on massive overdue payments to Lin—Defendants Schouten and Van den Berg were systematically siphoning corporate funds. Without any disclosure to Lin, and in direct contradiction of their fiduciary duties, Defendants caused Whoop to divert substantial capital toward the following unauthorized and non-business expenditures, all while deliberately keeping Lin's debts unpaid.

144.    Without any disclosure to Lin, Defendants Schouten and Van den Berg caused Whoop to divert corporate funds for the following unauthorized expenditures:

    i.    Purchasing vehicles worth over $900,000.00.

    ii.    Purchasing real estate worth over $3,000,000.00.

    iii.    Paying management fees of $3,500,000.00; and

    iv.    Extending related party loans of over $3,000,000.00.

145.    Given these alarming discoveries, and the fact that Defendant Whoop had ample capacity to satisfy its obligations, Lin remained focused on liquidation of the inventory and repayment for the numerous shipments of devices which Defendant Whoop received and presently still retains.

146.    However, Lin's efforts have been met with continued obstruction from Defendants Schouten and Van den Berg, who maintained possession of the inventory while refusing to remit the funds necessary to restore Lin's business operations. As a direct and proximate result of this intentional withholding of capital, Lin's business suffered catastrophic financial damage throughout 2025. The loss of liquidity paralyzed his operational capacity, forcing him to endure severe institutional strain and missed market opportunities while Defendants continued to benefit from the unauthorized use of his assets.

147.    Moreover, Lin continued to ask for specific trading details related to the device sales and Defendant Schouten failed to provide any response.

148.    Through his own research, Lin discovered that the sales price of the devices sold by Defendant Whoop was actually *much* higher than what Defendants originally represented.

149.    Furthermore, despite Defendants' persistent claims of a "stagnant market," there remained more than sufficient market demand to fully absorb Defendants' purported inventory within a short window of one to two months.

150.    Lin's own research also revealed that there were many instances in which Defendant Whoop did in fact sell tablets without paying Lin, and several instances in which Defendant Whoop sold devices at a higher price and volume than what was communicated and remitted to Lin—leaving questions as to where the additional funds went.

151.    To the best of Plaintiffs' knowledge and belief, the total volume of these undisclosed sales accounts for the majority of the purported "inventory field loss" and actual inventory shortages.

152.    Furthermore, the original value of these suppressed sales transactions effectively accounts for the majority of the original value of the inventory that Defendants reported to law enforcement as "stolen" or "lost.

153.    Defendants Schouten and Van den Berg, working in concert as co-principals of both Whoop and SunTak, systematically misrepresented and withheld material information from Lin throughout the course of their business relationship and orchestrated a campaign of misinformation to exploit Lin.

154.    On December 11, 2025 Lin made a request for records in accordance with Delaware law.

155.    As of the date of this filing, Defendants have not produced all records requested by Lin.

156. Defendants Whoop and SunTak breached their obligations by failing to pay Sunics the amounts reflected in the numerous purchase orders and invoices, which none of the Defendants ever objected to.

157. Defendants Schouten, Van den Berg, and Whoop have also failed to comply with the implied duty of good faith and fair dealing under the Agreement in failing to use commercially reasonable efforts in reselling the tablets to its customers and repaying Lin as agreed to under the Agreement.

158. Defendants Schouten and Van den Berg have also breached their fiduciary duties owed to Lin as a shareholder.

159. For example. Lin, despite being a significant minority shareholder in Defendant Whoop, only received his first dividend payment in 2023 and has been systematically excluded from the other four dividend distributions for nearly two years until late 2025.

160. Lin has been systematically excluded from fair dividend distributions, further illustrating Defendants' pattern of bad faith. Upon reviewing the 2024 financial reports in July 2025, Lin discovered that Defendants had secretly distributed dividends to other shareholders without notifying Lin and without sending any proportional payment to him.

161. Lin has not received a single formal notification regarding dividend distributions except the first one, nor was he made aware of any of the details pertaining to Defendant Whoop's dividend policies or profit allocations.

162. Lin has complied with all applicable Delaware laws and made the requisite pre-suit demand prior to bringing this action. To the extent, however, this Court determines that pre-suit notice was insufficient, any demands upon Defendants Schouten and Van ben Berg as directors of Whoop would be futile given the fractured relationship between Lin and Defendants Schouten and

Van den Berg. Moreover, a demand would be futile given that any demand made to Defendants Schouten and Van den Berg would essentially request Defendants Schouten and Van den Berg authorize Whoop to bring suit against themselves.

163.    Specifically, Plaintiffs gave notice of their intention to initiate litigation to Defendants via counsel on December 11, 2025.

164.    All conditions precedent to Lin bringing a derivative suit have either occurred, been satisfied, or have otherwise been waived.

## COUNT I
## BREACH OF CONTRACT
**(Asserted by Ranhao Lin against Whoop Connect, Inc.)**

165.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 164 of the Complaint, as if more fully set forth at length herein.

166.    By executing the Agreement, Whoop and Lin entered into a valid contract on July 28, 2022.

167.    Per the express terms of the Agreement, the Company was obligated to pay the purchase price for any device purchased from one of Lin's entities that was subsequently sold by Defendant Whoop.

168.    Lin performed all obligations under the Agreement in delivering the ACP-approved devices pursuant to Whoop's purchase orders as set forth in Section 1(b) of the Agreement.

169.    Whoop breached the Agreement by selling tablets to a third-party and failing to remit those funds to Lin for the full purchase price of those tablets.

170.    Moreover, the Agreement also expressly guaranteed that Lin would have the right to inspect books and records related to tablet and phone sales.

171.    Defendant Whoop has breached its duty under the Agreement by failing to provide the requested books and records related to tablet and phone sales.

172.    As a result of the foregoing, Whoop has caused Lin to suffer damages in an amount to be determined at trial, but in any event, not less than $10.255 million.

173.    As a result of the foregoing, Lin is entitled to monetary damages, interest, and the costs expended to bring this Action.

## COUNT II
## ACCOUNT STATED
**(Asserted by Sunics Industrial Limited against Whoop Connect, Inc.)**

174.    Sunics repeats and reiterates each and every allegation contained in paragraphs 1 through 173 of the Complaint, as if more fully set forth at length herein.

175.    An account existed between Plaintiff Sunics and Defendant Whoop, as evidenced by purchase orders and invoices between August 2023 and November 2025 and the Parties' regular course of dealing.

176.    To the extent Sunics is not a named party to any of the purchase orders, Sunics is entitled to recover any and all damages owed under the purchase orders and invoices pursuant to an assignment of interest.

177.    The purchase orders were personally signed by Defendant Schouten, thus evidencing Defendant Schouten's admission on behalf of Defendant Whoop that Defendant Whoop owed Plaintiff Sunics the amount stated on each purchase order and invoice.

178.    Defendant Whoop admitted to owing this debt after this account was created.

179.    Sunics performed all its obligations pursuant to these purchase orders, namely, by delivering the agreed upon quantity of devices to Whoop.

180.    Despite signing these purchase orders, agreeing to the terms, and accepting the units listed in each purchase order, Whoop has failed to remit payment.

181.    Defendant Whoop's failure to pay has caused Sunics to suffer damages, totaling approximately $6,155,660.00, as detailed below:

| Shipment Date | Commercial Invoice Number | Total Units | Balance Due | Buyer |
|---|---|---|---|---|
| August 24, 2023 | S4230605001D | 21600 | $576,600.00 | Whoop |
| August 31, 2023 | S4230605001E | 12560 | $732,100.00 | Whoop |
| | S4230629001A | 3640 | | |
| September 4, 2023 | S4230629001B | 21600 | $1,047,600.00 | Whoop |
| October 12, 2023 | S4230629001C | 21600 | $1,047,600.00 | Whoop |
| November 30, 2023 | S4230605002D | 1600 | $44,000.00 | Whoop |
| December 18, 2023 | S4231102001A | 3600 | $88,200.00 | Whoop |
| December 24, 2023 | S4231102001B | 9360 | $382,580.00 | Whoop |
| | S4230629001D | 3160 | $123,480.00 | |
| January 4, 2024 | S4231102001C | 5040 | $123,480.00 | Whoop |
| January 14, 2024 | S4231121001A | 14400 | $772,800.00 | Whoop |
| January 22, 2024 | S4231121001B | 10800 | $588,600.00 | Whoop |
| February 7, 2024 | S4231212001A | 10800 | $588,600.00 | Whoop |
| May 15, 2024 | S4231212001B | 3000 | $163,500.00 | Whoop |

182.    Whoop never objected to any of the terms contained within any of the invoices sent to it by Sunics, including the amounts listed as owed.

183.    Whoop received and retained the inventory underlying the purchase orders and invoices.

184.    As a result of the foregoing, Sunics is entitled to monetary damages in an amount to be determined at trial, but in any event not less than $6,155,660.00plus interest, and the costs expended to bring this Action.

## COUNT III
## ACCOUNT STATED
### (Asserted by Sunics Industrial Ltd against SunTak USA, Inc.)

185.    Sunics repeats and reiterates each and every allegation contained in paragraphs 1 through 184 of the Complaint, as if more fully set forth at length herein.

186.    An account existed between Plaintiff Sunics and SunTak, as evidenced by dozens of purchase orders and invoices between August 2023 and November 2025 and the Parties' course of dealings.

187.    To the extent Sunics is not a named party to any of the purchase orders, Sunics is entitled to recover any and all damages owed under the purchase orders pursuant to an assignment of interest.

188.    The purchase orders were personally signed by Defendant Schouten, thus evidencing Defendant Schouten's admission on behalf of Defendant SunTak that Defendant SunTak owed Plaintiff Sunics the amount stated on each purchase order and invoice.

189.    Defendant Whoop admitted to owing this debt after this account was created, and never objected to any of the purchase orders or invoices.

190.    Sunics performed all its obligations pursuant to these purchase orders, namely, by delivering the agreed upon quantity of devices to SunTak.

191.    Despite signing these purchase orders, agreeing to the terms, and accepting the units listed in each purchase order, SunTak has failed to remit payment.

31

192.    Defendant SunTak's failure to pay has caused Sunics to suffer damages, totaling approximately $3,119,160.00, detailed below:

| Shipment Date | Commercial Invoice | Total Units | Balance Due | Buyer |
|---|---|---|---|---|
| November 5, 2023 | S4230912001A | 17280 | $734,400.00 | SunTak |
| December 18, 2023 | S4231024001A | 3000 | $193,496.00 | SunTak |
| December 24, 2023 | S4230912001B | 4320 | $183,600.00 | SunTak |
| January 4, 2024 | S4231023001B | 7200 | $357,120.00 | SunTak |
| February 6, 2024 | S4231212002A | 6480 | $321,408.00 | SunTak |
| February 7, 2024 | S4231212002B | 3600 | $178,560.00 | SunTak |
| May 15, 2024 | S4240328001A | 4800 | $196,800.00 | SunTak |
| September 4, 2024 | S4240516001A | 10,980 | $629,116.00 | SunTak |
| November 27, 2024 | S4240815001A | 10,140 | $324,660.00 | SunTak |

193.    As a result of the foregoing, Sunics is entitled to monetary damages in an amount to be determined at trial but not less than $3,119,160.00 plus interest, and the costs expended to bring this Action.

**COUNT IV**
**BREACH OF FIDUCIARY DUTIES**
**(Asserted by Ranhao Lin directly and derivatively on behalf of Whoop Connect, Inc. against Eric Stefan Schouten)**

194.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 193 of the Complaint, as if more fully set forth at length herein.

195.    As CEO of Defendant Whoop, Defendant Schouten controlled and directed Whoop's corporate activities.

196.    As the CEO of Defendant Whoop, Defendant Schouten owed fiduciary duties to both Whoop and Lin (who at all times relevant to this dispute was, and still is, a shareholder in Whoop).

197. These fiduciary duties include a duty of care, loyalty, good faith, and disclosure.

198. Defendant Schouten breached his fiduciary duties to both Whoop and its other shareholders, including Lin, by engaging in and/or causing others to engage in, the mismanagement and misappropriation of Whoop's funds for his personal benefit, overseeing the creation of phony financial documents to be disseminated to key stakeholders, as well as concealing and failing to provide pertinent information regarding Whoop's financial health.

199. Specifically, Defendant Schouten breached his fiduciary duties requiring that he deal with Lin honestly by misrepresenting purchase prices for inventory sold by Whoop and concealing at least two tablet sales from Lin.

200. Defendant Schouten further breached his fiduciary duties to Lin by lying to Lin about the status of device inventory, failing to make corporate books available for inspection, misusing corporate funds, and enriching himself as opposed to acting in the best interests of Whoop and its shareholders, specifically Lin.

201. Defendant Schouten has breached his duty of loyalty to Lin by mismanaging Whoop, including but  not limited to, Defendant Schouten's inability to liquidate the device inventory, failing to pay the outstanding invoices owed to Lin, and by utilizing Whoop funds to maintain his own high-profile lifestyle by purchasing luxury cars and real estate.

202. Defendant Schouten breached his fiduciary duties to Whoop by failing to run it in a manner consistent with a prudent fiduciary, instead opting to extract as much money as he could personally, to the ultimate detriment of the company, including by *inter alia* (1) utilizing Whoop's funds to maintain his own high-profile lifestyle by purchasing luxury cars and real estate, (2) paying himself and Defendant Van den Berg excessive compensation in the form of "management

fees," and (3) engaging in related party transactions on commercially unreasonable terms, all while the company teetered on insolvency.

203. As a direct and proximate result of Defendant Schouten's breaches of fiduciary duties, Lin and Whoop have both been damaged in an amount to be determined at trial but not less than $9.8 million.

## COUNT V
## BREACH OF FIDUCIARY DUTIES
### (Asserted by Ranhao Lin directly and derivatively on behalf of Whoop Connect, Inc. against Frank van den Berg)

204. Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 203 of the Complaint, as if more fully set forth at length herein.

205. As a director of Defendant Whoop, Defendant Van den Berg controlled and directed Whoop's corporate activities.

206. As a director of Defendant Whoop, Defendant Van den Berg owed fiduciary duties to both Whoop and Lin.

207. These fiduciary duties include a duty of care, loyalty, good faith, and disclosure.

208. Defendant Van den Berg breached his fiduciary duties to both Whoop and its other shareholders, including Lin, by engaging in and/or causing others to engage in, the mismanagement and misappropriation of Whoop's corporate funds, creating and disseminating phony financial records to key stakeholders (including Lin), and failing to provide pertinent information regarding Whoop's financial health.

209. Specifically, Defendant Van den Berg breached his fiduciary duties by failing to sell the remaining tablet inventory, by misrepresenting purchase prices, and concealing several tablet sales from Lin.

34

210.    Defendant Van den Berg further breached his fiduciary duties to Lin by lying to Lin about the status of device inventory, failing to make corporate books available for inspection, misusing corporate funds, and enriching himself as opposed to acting in the best interests of Whoop and its shareholders, specifically Lin.

211.    Defendant Van den Berg has breached his duty of loyalty to Lin by mismanaging Whoop, including but not limited to, Defendant Van den Berg's inability to liquidate the device inventory, pay the outstanding invoices owed to Lin, and by utilizing Whoop funds to maintain his own high-profile lifestyle by purchasing luxury cars and real estate.

212.    Defendant Van den Berg breached his fiduciary duties to Whoop by failing to run it in a manner consistent with a prudent fiduciary, instead opting to extract as much money as he could personally, to the ultimate detriment of the company, including by *inter alia* (1) utilizing Whoop's funds to maintain his own high-profile lifestyle by purchasing luxury cars and real estate, (2) paying himself and Defendant Schouten excessive compensation in the form of "management fees," and (3) engaging in related party transactions on commercially unreasonable terms, all while the company teetered on insolvency.

213.    As a direct and proximate result of Defendant Van den Berg's breaches of fiduciary duties, Lin and Whoop have both been damaged in an amount to be determined at trial but not less than $9.8 million.

## COUNT VI
## ACCOUNTING
### (Brought by Ranhao Lin against Whoop Connect, Inc.)

214.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 213 of the Complaint, as if more fully set forth at length herein.

215.     Section 1(b)(iii) of the Agreement provides that to verify sales and payment of the agreed upon purchase price, Lin has the right to inspect Whoop's books and records relating to the tablet sales.

216.     Lin demands Whoop's books and records, but was provided with phony and otherwise incomplete records.

217.     Lin hereby demands an accounting pursuant to his rights under the Agreement for all sales of tablets made by Whoop and its subsidiaries pursuant to this Agreement.

## COUNT VII
## UNJUST ENRICHMENT
### (Asserted by Sunics Industrial Limited against
### Whoop Connect, Inc., and SunTak USA Inc. pled in the alternative)

218.     Sunics repeats and reiterates each and every allegation contained in paragraphs 1 through 217 of the Complaint, as if more fully set forth at length herein.

219.     Between March 20, 2023, and November 27, 2024, Sunics conferred a benefit on Whoop and SunTak in the form of ACP approved devices that were purchased by Whoop and SunTak for re-sale.

220.     These ACP approved devices were shipped and delivered by Sunics and received by Whoop and SunTak.

221.     Whoop and SunTak retained these ACP approved devices and Sunics was never compensated for the ACP approved devices.

222.     Whoop and SunTak have retained approximately $9,274,820 worth of ACP-approved devices, of which approximately $6,155,660 is retained by Whoop and $3,119,160 is retained by SunTak.

223.     Whoop and SunTak have no justification for retaining the ACP approved devices without payment to Sunics.

36

224.    Sunics has been damaged as a result and has no adequate remedy at law.

225.    As a result of the foregoing, Sunics is entitled to monetary damages, interest, and the costs expended to bring this Action.

## COUNT VIII
## CORPORATE WASTE
**(Asserted Derivatively Against Eric Stefan Schouten and Frank Van Den Berg as Directors and Officers of Whoop)**

226.    Lin repeats and re-alleges the allegations contained in Paragraphs 1 through 225 of this Complaint, as if fully set forth herein.

227.    Defendants Schouten and Van Den Berg are the sole directors and officers of Whoop in charge of the day-to-day operations of the company.

228.    Abusing their roles as directors and officers of the Companies, Defendants Schouten and Van Den Berg have engaged in a persistent and systematic course of conduct to loot Whoop and otherwise waste the company's assets to the detriment of the company and for their own respective personal benefit(s).

229.    Defendants Schouten and Van Den Berg's conduct has spanned multiple years, and they have gone to great lengths to conceal their misdeeds from Lin by producing limited, misleading, and even outright false documentation concerning Whoop's finances.

230.    Defendants Schouten and Van Den Berg's waste of Whoop's assets includes *inter alia*, (i) transferring ostensibly corporate funds to accounts in the Netherlands over which they exercise complete custody and control, (ii) using corporate funds to purchase vehicles for their personal use totaling approximately $900,000, (iii) purchasing real estate in excess of $3 million which has no legitimate business purpose, (iv) paying management fees to  Defendant Schouten and Van Den Berg in excess of $3.5 million, (v) extending related loans to parties related to Defendants Schouten and Van Den Berg totaling approximately $3 million, (vi) paying for meals

and travel expenses (including hotels) in excess of $750,000, and (vii) generally diverting corporate assets for their own and personal benefit to the detriment of the company and its shareholders.

231.    Defendant Schouten and Van Den Berg's conduct has adversely affected the value of the Lin's stock in Whoop, and further threatens the viability of Whoop as a going concern.

232.    Lin, as a minority shareholder in Whoop, has standing to derivatively seek redress for damages suffered by Whoop for the corporate waste Defendants Schouten and Van Den Berg have committed during the years that they have overseen the company and exercised full control over the finances.

233.    Plaintiff Lin has raised the foregoing issues with Defendants Schouten and Van Den Berg's expenditures with Defendants Schouten and Van Den Berg, but they have refused to take any action, reimburse the company, and have further denied that the foregoing expenditures were in any way illegitimate.

234.    Should any deficiency with Plaintiff Lin's demand be raised, since Plaintiff Lin would be asking Defendants Schouten and Van Den Berg to sue themselves by bring a demand to Whoop's leadership, which is comprised solely of Defendants Schouten and Van Den Berg, the Court has good cause to excuse any demand deficiencies here since Defendants Schouten and Van Den Berg's conduct has reflected that any further demand(s) would be futile.

235.    As a result of Defendants Schouten and Van Den Berg's foregoing misconduct, Whoop has been damaged in an amount to be determined at trial, but not less than $8,150,000.00

## COUNT IX
## FRAUDULENT INDUCEMENT
### (Asserted by Ranhao Lin against Eric Stefan Schouten)

236. Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 235 of the Complaint, as if more fully set forth at length herein.

237. During the summer of 2022, prior to Lin's initial investment, Defendant Schouten made material misrepresentations to Lin concerning Defendant Whoop's operational capabilities and risk management strategies, with the aim of demonstrating Whoop's business acumen to induce Lin to invest in the company and supply it with products.

238. During these formative discussions, Schouten assured Lin that Defendants would meticulously manage inventory risk through strategic ordering and emphasized their specialized ability to liquidate any remaining inventory in the event of a market shift.

239. These representations were the cornerstone of the Parties' trading framework; however, Defendants' conduct since June 2024—and their categorical denial of liability since December 2025—reveals that these initial assurances and representations were patently false.

240. Defendants' conduct, such as their insistence on ordering more devices at a time when the ACP was looking likely to be terminated, demonstrates they never had any inventory risk management strategies.

241. By now claiming they have no obligation to pay for unsold inventory and shifting all market risk onto Lin, Defendants have exposed that their 2022 statements were not legitimate, but rather fraudulent inducements designed to secure Lin's capital under false pretenses.

242. Defendant Schouten knew or should have known of the falsity of the statements.

243. Defendant Schouten intended that the false statements induce Lin's reliance.

244. Lin justifiably relied on the false statements to his detriment because Lin agreed to enter into the Agreement with Defendant Schouten and supply devices to Defendant Whoop.

245. Because of this fraudulent inducement, Lin has suffered damages in the amount of $800,000.00.

## COUNT X
## FRAUDULENT MISREPRESENTATION
### (Asserted by Ranhao Lin against Eric Stefan Schouten)

246. Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 245 of the Complaint, as if more fully set forth at length herein.

247. Throughout the course of their business relationship, Defendant Schouten made fraudulent misrepresentations of material facts to Lin regarding Defendant Schouten's ability and plans to clear the device inventory and pay outstanding invoices.

248. Specifically, in June 2024, Defendant Schouten represented that he was meeting with several brands in the United States with the intention of selling the remaining tablets.

249. Similarly, in December 2024, Defendant Schouten represented to Lin that device sales would occur soon to clear outstanding invoices.

250. Additionally, in March 2025, Defendant Schouten falsely represented that he had secured a project that would liquidate all remaining inventory, *i.e.* the "Kansas Project," which Schouten represented was a "done deal," but turned out to be nothing more than a sham as there was no such deal ever close to consummation.

251. However, when Lin asked Defendant Schouten for status updates as to these plans, Lin was met with silence, evasive answers, or affirmative misrepresentations concerning the then-present status of "deals" that were allegedly in the works, but were complete fabrications.

252. Defendant Schouten knew or should have known of the falsity of the statements.

40

253.    Defendant Schouten intended to induce Lin to act on these false statements, including by having Lin continue to supply devices and forbear from taking any action to collect on the considerable debts owed by Whoop.

254.    Lin relied on these false representations by continuing to supply devices and refraining from taking action to collect the long overdue payments.

255.    Based on Defendants' persistent assurances of imminent liquidation and their fabricated excuses for delay, Lin was induced to maintain the status quo and refrain from exercising his contractual and legal remedies.

256.    Defendant Schouten engaged in the foregoing fraudulent conduct because it enabled him to continue looting Whoop without restraint.

257.    As a result of Defendant Schouten's conduct, Lin suffered damages in an amount to be determined at trial but in any event no less than $10.25 million, plus interest.

## COUNT XI
## FRAUDULENT CONCEALMENT
### (Asserted by Ranhao Lin against Eric Stefan Schouten)

258.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 257 of the Complaint, as if more fully set forth at length herein.

259.    Defendant Schouten concealed or failed to disclose material facts to Lin, including but not limited the true sales price and volume of tablets Whoop sold to certain third-parties, Whoop's relationship with third-party distributors and several device sales which were wholly concealed from Lin.

260.    Defendant Schouten knew or should have known that these material facts should have been disclosed to Lin.

261. Defendant Schouten knew the concealment or failure to disclose these material facts would induce Lin to act.

262. Defendant Schouten had a duty to disclose these material facts to Lin.

263. Lin detrimentally relied on the concealed information.

264. As a result of Defendant Schouten's foregoing conduct, Lin suffered damages in an amount to be determined at trial but in any event no less than $3.5 million, plus interest.

**COUNT XII**
**FRAUDULENT CONCEALMENT**
**(Asserted by Ranhao Lin against Frank van den Berg)**

265. Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 264 of the Complaint, as if more fully set forth at length herein.

266. Defendant Van den Berg concealed or failed to disclose material facts to Lin, including but not limited the true sales price and volume of tablets Whoop sold to certain third-parties, Whoop's relationship with third-party distributors, and several device sales which were wholly concealed from Lin.

267. Defendant Van den Berg knew or should have known that these material facts should have been disclosed to Lin.

268. Defendant Van den Berg knew the concealment or failure to disclose these material facts would induce Lin to act.

269. Defendant Van den Berg had a duty to disclose these material facts to Lin.

270. Lin detrimentally relied on the concealed information.

271. As a result of Defendant Schouten's foregoing conduct, Lin suffered damages in an amount to be determined at trial but in any event no less than $3.5 million, plus interest.

42

**COUNT XIII**
**CIVIL CONSPIRACY TO COMMIT FRAUD**
**(Asserted by Ranhao Lin against Eric Stefan Schouten and Frank van den Berg)**

272.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 271 of the Complaint, as if more fully set forth at length herein.

273.    Defendants Schouten and Van den Berg willingly and knowingly conspired with one another to defraud Lin, including but not limited to, making misrepresentations to Lin, creating falsified documents, and concealing vital information from Lin with the aim of directly profiting at Lin's expense.

274.    The object of Defendants Schouten and Van den Berg's conspiracy was to maintain the supply relationship between Lin and Defendants Whoop and SunTak, entities from which Schouten and Van den Berg could freely extract monies, all the while systematically obstructing Lin's recovery of overdue debts, which would bring their operation to an end.

275.    By orchestrating a unified front of deception, Defendants Schouten and Van den Berg sought to postpone the discovery of the critical mismatch between the inventory in Whoop and SunTak's possession and the figures that were ultimately reported to Lin.

276.    Defendants Schouten and Van den Berg intentionally obfuscated and concealed the truth from Lin by misrepresenting key facts, such as the purchase prices for inventory sold and giving Lin phony financial documents, with the aim of delaying Lin's collection efforts, thereby buying the Defendants the necessary time to continue the unauthorized diversion of corporate funds for their personal benefit while ensuring the $10.255 million debt remained uncollected.

277.    There was a meeting of the minds between Defendants Schouten and Van den Berg to accomplish their object of defrauding Lin to enrich themselves.

278.    This agreement to defraud Lin was tortious and an agreement to do an unlawful act, including but not limited to making fraudulent statements, fraudulently concealing material information, and breaching fiduciary duties to Lin.

279.    As a proximate result of these unlawful acts, Lin has suffered damages in an amount to be determined at trial but in no event less than $10.255 million.

**COUNT XIV**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING**
**(Asserted by Ranhao Lin against Whoop)**

280.    Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 279 of the Complaint, as if more fully set forth at length herein.

281.    The Agreement is a valid agreement entered into between Lin and Whoop.

282.    Implied in the Agreement, as in all agreements, is the covenant of good faith and fair dealing.

283.    In accordance with the implied covenant of good faith and fair dealing is an implicit promise that Whoop would not engage in dishonest conduct vis-à-vis Lin, such as giving him falsified books and records concerning the terms under which Whoop sold the inventory Lin (and his entities) supplied to Whoop pursuant to the Agreement and otherwise providing him with false information concerning the sales Whoop engaged in.

284.    In accordance with the implied covenant of good faith and fair dealing, there was an implicit promise that Whoop would use commercially reasonable efforts to maximize the return for the inventory it received, which it did not do, as evidenced (at least in part) by Whoop selling tablets below the prevailing market price.

285.    Accordingly, Whoop has breached the implied covenant of good faith and fair dealing by *inter alia* (1) providing Lin with false information concerning the sales of inventory Whoop engaged in, (2) providing Lin with falsified financial records misstating the terms under

which Whoop sold its inventory to underreport its financial health, and (3) failing to engage in commercially reasonable efforts to sell the inventory Lin and his entities suppled Whoop with.

286.   As a resulted of Whoop's foregoing breaches, Lin has suffered damages in an amount to be determined at trial but in no event less than $10.255 million.

**COUNT XV**
**FRAUDULENT CONVEYANCE**
**(Asserted by Ranhao Lin against Whoop, Eric Stefan Schouten, and Frank van den Berg)**

287.   Lin repeats and reiterates each and every allegation contained in paragraphs 1 through 286 of the Complaint, as if more fully set forth at length herein.

288.   Whoop, by virtue of the considerable debts owed to Lin, was functionally insolvent as of the termination of the ACP in May 2025.

289.   However, rather than pay its debts to Lin, Whoop transferred considerable assets to Defendant Schouten and Van den Berg in the form of "management fees" and alleged "repayment" of related party transactions that occurred subsequent to the debts being occurred.

290.   Accordingly, all transfers made to Defendant Schouten and Van den Berg should be voided as fraudulent conveyances within the meaning of 6 Del. C. §1305 since Lin was a then-present creditor at the time the transfers were made and Defendants Schouten and Van den Berg, as the sole parties with visibility into Whoop's financial condition and direct control over its operations, knew full well that the monies they received from Whoop should have been paid to Lin.

291.   Therefore, sums totaling approximately $9.8 million should be disgorged by Defendants Schouten and Van den Berg.

45

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all claims and issues so triable in connection with their claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Court enter:

A.  Judgment in Plaintiffs' favor on Counts I – XV and all relief pertaining thereto, including monetary damages in an amount to be determined at trial but not less than $10.255 million, plus interest, punitive damages, costs, and attorneys' fees;

B.  An Order directing that Defendants provide an accounting reflecting all of Defendants' revenue and profits realized on their sales of Plaintiffs' inventory;

C.  An award of pre- and post-judgment interest; and

D.  Such other and further relief as the Court deems just and proper.

Dated: April 9, 2026                    Respectfully Submitted,

WINDELS MARX LANE & MITTENDORF, LLP

By *Gabriel Altman*
Scott R. Matthews
Gabriel Altman
156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
smatthews@windelsmarx.com
galtman@windelsmarx.com

ADAM M. SCHACHTER
New York Bar No. 3810775
aschachter@gsgpa.com
ALESSANDRA M. SIBLESZ (*pro hac vice*
application forthcoming)
asiblesz@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.

One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
Facsimile: (305) 728-0951
E-service: efilings@gsgpa.com

*Counsel for Plaintiff Ranhao Lin, and Sunics
Industrial Ltd.*